UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MILWAUKEE HEALTH SERVICES, INC.,

    Plaintiff,

  v.

BUSINESS COMPUTER APPLICATIONS, INC.,

Case No. 13-CV-00797

    Defendant.

---

## BRIEF IN SUPPORT OF MILWAUKEE HEALTH SERVICES, INC. MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Milwaukee Health Services, Inc. ("MHSI") moves this Court for a Temporary Restraining Order ("TRO") and Preliminary Injunction to require Defendant Business Computer Applications, Inc. ("BCA") to restore connectivity to its Pearl Electronic Medical Record software so that MHSI can access its patient records which are needed immediately for the treatment of patients. Without this access, the safety of about 40,000 MHSI patients is at serious risk, as these records contain clinical notes, medication information and other pertinent information MHSI medical personnel use to provide patient care. Because MHSI and thousands of patients will suffer irreparable harm, and because MHSI has no adequate legal remedy, has a likelihood of success on the merits of the Complaint filed concurrently herewith, the balance of harms weigh in its favor, and the public interest would be best served by restoring MHSI's access to its patient records, MHSI is entitled to immediate injunctive relief and asks this Court to grant its Motion for a TRO and Preliminary Injunction.

WHD/9641797.2

## FACTUAL BACKGROUND

I.  **The Parties.**

MHSI is a corporation organized and existing under the laws of the State of Wisconsin with a principal place of business of 2555 N. Martin L. King, Jr. Drive, Milwaukee, Wisconsin 53212. (Complaint ("Compl."), ¶ 1.) MHSI is a Federally Qualified Health Center ("FQHC") that serves about 40,000 patients each year in Milwaukee, Wisconsin. (Compl., ¶ 2.) MHSI offers preventative health, wellness and chronic disease management in primary care including by physicians specializing in the care of underserved populations. (Compl., ¶ 3.) MHSI's comprehensive services include Pediatrics, Family Medicine, Internal Medicine, Obstetrics and Gynecology, Midwifery, Podiatry, HIV Infectious Disease, Oral Health, Adult and Child Psychiatry. Additional onsite services offered include: behavioral health therapy, outreach social services, prenatal and chronic disease nursing case management, patient education, WIC and nutritional services, insurance benefit determination and pharmacy. (*Id.*) MHSI serves everyone regardless of income or third party coverage and seeks to provide high quality care in accessible locations in Milwaukee County. (*Id.*)

From January 2006 to May 2011, Dr. Tito Izard served as Chief Medical Officer ("CMO") for MHSI. (Compl. ¶ 4.) From August 2010 to May 2011, he served as the Interim President/CEO and CMO for MHSI after then-President/CEO C.C. Henderson died in August 2010. C.C. Henderson had served as MHSI President/CEO from 2002 until August 2010. (*Id.*)

BCA is a corporation organized and existing under the laws of the State of Tennessee, with a principal place of business of 2180 Satellite Boulevard, Suite 325, Duluth, Georgia 30097 and provides information technology products and services for the health care industry and public health infrastructure. (Compl. ¶ 5.)

**II.     The Agreements Between the Parties.**

On November 30, 1999, MHSI entered into a Standard Service Agreement, a Standard Maintenance Agreement a Standard License Agreement, and a Hardware End User Agreement with BCA for use of a Clinic Management System ("CMS") that assisted MHSI with appointment scheduling, patient billing, and accounts receivable, among other things (hereinafter called "CMS Agreement"). (Compl. ¶ 7.)

On July 1, 2008, MHSI entered into a Business Associate Confidentiality Agreement, a Software License Agreement, a Third Party Software and Hardware End User Agreement, a Software Maintenance Agreement, an Application Service Provider Hybrid Data Center Support Services Agreement, and a Service Agreement with BCA for purposes of developing, installing and using an electronic medical record ("Pearl EMR") (hereinafter called "EMR Agreement") that would integrate with the existing appointment scheduling and patient billing CMS practice management system. (Compl. ¶ 8.)

Despite MHSI paying BCA $3,083,607.64 since 2008 under the EMR Agreement and CMS Agreement, the Pearl EMR developed and installed by BCA has failed to be fully functional. (Compl. ¶ 9.) Nevertheless, the Pearl EMR currently is the only way for MHSI to access patient records housed on MHSI servers. (Compl. ¶ 10.) These patient records contain clinical notes, medical specialist authorization requests, medication lists, problem lists, allergy reports, pediatric immunization records, obstetric documents, hospital records, surgical and consultation reports, pre-op documents, mammography and radiographic reports and chronic disease treatment plans for approximately 40,000 individuals. (Compl. ¶ 11.)

The EMR Agreement was set to expire on June 30, 2013. (Compl. ¶ 12.) Because of the various problems with implementation, failure of the Pearl EMR to ensure compliance with

HIPAA, HITECH Act and Meaningful Use Stage II criteria, as well as escalating expenses incurred with the Pearl EMR, MHSI decided to migrate to another EMR product, GE Centricity. (*Id.*) Before the expiration of the EMR Agreement, MHSI tried to address the transition from the Pearl EMR to the GE Centricity EMR by exploring a temporary extension of the Pearl EMR licensing agreement or the provision of a removable disk (or "jump drive") containing all the patient records so that MHSI would not face any disruption in patient record access. (Compl. ¶ 13.) Specifically, Albert Woodard, CEO of BCA, informed Dr. Tito Izard on June 21, 2013 that he could provide MHSI with a jump drive of all MHSI patient records if MHSI did not extend the license agreement. (*Id.*) BCA falsely represented to MHSI that it would not have any disruption in patient care during these negotiations because BCA has not followed through on its promise to either maintain Pearl EMR connectivity or provide MHSI with a jump drive so that MHSI could have access to its patient records. (Compl. ¶ 14.)

BCA's legal counsel wrote MHSI on June 5, 2013 stating that MHSI owed BCA $285,097.03 for products and services and that the letter served as a "final pre-litigation notice." (Compl. ¶ 15.) This demand for payment was made even though MHSI paid BCA $3,083,607.64 for the Pearl EMR and CMS Agreement and had recently made payments to BCA of $8,443 on May 2013 and $25,400 in April 2013. (Compl. ¶ 16.)

### III.  BCA Wrongfully Terminates Access To Patient Records.

Despite these recent payments, numerous requests by MHSI for documentation of the authorized detailed expenditures alleged by BCA and continuous discussions between Dr. Izard and BCA's CEO about not disrupting patient record access while MHSI transitioned to GE Centricity, BCA terminated MHSI's access to the Pearl EMR on June 30, 2013 by performing an unauthorized remote disconnection from MHSI's personal local servers housing MHSI's patient

data. (Compl. ¶ 17.) As a result of this unauthorized access to MHSI's servers on June 30, 2013, MHSI has been unable to access patient records for purposes of providing treatment, jeopardizing the health and safety of about 40,000 people. (Compl. ¶ 18.)

Since July 1, 2013, MHSI has made repeated requests to BCA to restore Pearl EMR connectivity or provide MHSI with a removable disk containing all the patient records in a readable format so that MHSI could continue providing treatment to its patients, but BCA has refused to provide either. (Compl. ¶ 19.)

Despite these repeated requests, good faith efforts to resolve the issue short of litigation and advice from BCA's legal counsel to restore Pearl EMR connectivity, BCA has refused to restore Pearl EMR connectivity or provide MHSI the patient records in a readable format on a removable disk unless MHSI makes a full or substantial payment toward the $285,097.03 it alleges MHSI owes BCA. (Compl. ¶ 20.) In particular, in an email from Albert Woodard, BCA CEO to Dr. Izard on July 1, 2013, Mr. Woodard responded to Dr. Izard's question of how long it would take to re-establish connectivity to MHSI's patient data by stating that BCA would restore Pearl EMR connectivity in exchange for approximately $300,000, in spite of the advice of BCA's legal counsel to restore Pearl EMR connectivity. (*Id.*) In addition, in response to a July 3, 2013 email from Dr. Izard stating that it had been greater than 48 hours since MHSI patients have had access to any electronic health information, Mr. Woodard repeated that MHSI owes BCA approximately $300,000 in past due accounts receivable and that BCA would not provide MHSI with any access to patient data without "fair compensation." (*Id.*)

Short of hiring another computer programmer to write a program to retrieve the patient records off MHSI's services, which could take a very long time, there is no other viable, quick option to retrieve the patient records so that MHSI can use those records for patient treatment.

(Compl. ¶ 21.) As a result, BCA's refusal to allow MHSI access to its patient records has caused a disruption in MHSI's ability to deliver safe and effective patient treatment and to respond to requests for patient records from patients and others in the community. (Compl. ¶ 22.)

IV. **Procedural Posture.**

On July 8, 2013, BCA filed in the Superior Court of Dekalb County in the State of Georgia a Complaint for Damages and Declaratory Judgment, Case No. 13-CV-7400-7 ("BCA Complaint"). (Affidavit of Barbara J. Zabawa (hereinafter "Zabawa Affidavit"), ¶ 9.) MHSI was served with the BCA Complaint on July 11, 2013. (*Id.*) MHSI has sought to remove the BCA Complaint to the Northern District of Georgia, Atlanta Division. (*Id.*) BCA's Complaint alleges claims of breach of contract, promissory estoppel, quantum meruit, unjust enrichment and declaratory judgment and seeks $286,294.53 in damages from MHSI. (Zabawa Affidavit, ¶ 10.) BCA also filed on July 11, 2013 an "Emergency Motion for Declaratory Judgment" in the Dekalb County Court in Georgia (hereinafter "BCA's Emergency Motion"). (Zabawa Affidavit, ¶ 11.) BCA's Emergency Motion seeks a declaration that pursuant to the terms of the EMR Agreement, it has no ongoing obligation to provide MHSI with access to the Pearl EMR and that MHSI's license to use the Pearl EMR expired and/or was properly terminated on June 30, 2013. (*Id.*)

MHSI has filed a motion to transfer BCA's Complaint to this Court for the reasons set forth in MHSI's Motion to Decline to Hear BCA's Declaratory Judgment Action and to Transfer Venue to the Eastern District of Wisconsin. (Zabawa Affidavit, ¶ 12.)

# LEGAL STANDARD

### A. Legal Standard Governing Temporary Restraining Orders and Preliminary Injunctions.

"The standards for issuing temporary restraining orders are identical to the standards for preliminary injunctions." *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill., 2001). The standards for preliminary injunctive relief are well established. *Wis. Coal. for Advocacy, Inc. v. Czaplewski*, 131 F. Supp. 2d 1039, 1044 (E.D. Wis. 2001). The moving party is required to demonstrate some likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if preliminary relief is denied. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992); *see also Long*, 167 F. Supp. 2d at 990 (stating that party seeking TRO bears burden of showing: 1) the case has some likelihood of success on the merits; 2) that no adequate remedy at law exists; and 3) it will suffer irreparable harm if the injunction is not granted) (citing *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

If the moving party can pass this threshold, the court will then consider any irreparable harm a preliminary injunction would cause to the nonmoving party, as well as the consequences to nonparties of granting or denying the requested relief. *Abbott Labs.*, 971 F.2d at 11–12. Then, sitting as would a court of equity, the court weighs all of these factors on a sliding scale; the more likely that the plaintiff will succeed on the merits, the less the balance of harms need favor him. *Diginet, Inc. v. W. Union ATS, Inc.,* 958 F.2d 1388, 1393 (7th Cir.1992); *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 461 (7th Cir. 2000). Stated in a slightly different way, "[i]n assessing whether a preliminary injunction is warranted, a court must consider whether the party seeking the injunction has demonstrated that: 1) it has a reasonable likelihood of success on the merits of the underlying claim; 2) no adequate remedy at law exists; 3) it will suffer irreparable

harm if the preliminary injunction is denied; 4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest." *Kiel v. City of Kenosha*, 236 F.3d 814, 815-16 (7th Cir. 2000)).

If a temporary restraining order is issued, the motion for preliminary injunction must be set for hearing at the earliest possible time, taking precedence over all other matters, except hearings on matters of the same character. Fed. R. Civ. P. 65(b)(3); *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters,* and *Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439, (1974) ("*Ex parte* temporary restraining orders are no doubt necessary in certain circumstances, but under federal law they should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer").

Many judges have properly insisted that when time does not permit for formal notice of the application for a temporary restraining order to the adverse party, some other expedient informal notice, such as telephonic notice to the attorney for the adverse party, should be done. *See* Fed. R. Civ. P. 65(b) (advisory committee notes to 1966 Amend.). However, in some circumstances, temporary restraining orders may be issued without any notice even if it is feasible to provide fair, although informal notice to the adverse party. *See id.* Where an adverse party has notice and responds to a request for a temporary restraining order and/or motion for preliminary injunction, the Court should treat the motion as one for a preliminary injunction. *See Akbar v. Borgen,* 796 F.Supp. 1181, 1185 (E.D. Wis. 1992).

B.   The Computer Fraud and Abuse Act.

The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "Act"), prohibits individuals and entities from accessing and/or damaging protected computers without authorization or by exceeding its authorization. *See* 18 U.S.C. § 1030.  A "protected computer" is either a computer that is used by the United States Government, and the conduct constituting the offense affects the Government's use of the computer; or a computer that is used in or affects interstate or foreign commerce or communications.  18 U.S.C. § 1030(e).  A connection to the internet qualifies as "affecting interstate commerce or communication."  *Cont'l. Grp., Inc. v. KW Prop. Mgmt., LLC*, 622 F.Supp.2d 1357, 1370 (S.D. Fla. 2009) (citing 18 U.S.C. § 1030(e)(2)(B).)

Among the many prohibitions enumerated, the Act prohibits one from intentionally accessing a protected computer without authorization, and as a result of such conduct, causes damages and loss.  18 U.S.C. § 1030(a)(5)(B).  Further, the Act prohibits one from transmitting in interstate commerce any of the following types of communications with the intent to extort any money or other thing of value: (a) a threat to cause damage to a protected computer; (b) a threat to obtain information from a protected computer without authorization or in excess of authorization or to impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access; or (c) a demand or request for money or other thing of value in relation to damage to a protected computer, where such damages was caused to facilitate the extortion.  *See* 18 U.S.C. § 1030(a)(7).  The Computer Fraud and Abuse Act defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).

While violations of the Act constitute crimes, any person who suffers damage or loss by reason of a violation under the Act may maintain a civil action against the violator to obtain

compensatory damages and injunctive relief or other equitable relief, where the offense causes, *inter alia,*: (a) loss to one or more persons of at least $5,000 aggregated during any 1-year period; (b) modification or impairment, or potential modification or impairment of the medical examination, diagnosis, treatment or care of one or more individuals; (c) physical injury to a person; or (d) a threat to public health or safety. 18 U.S.C. § 1030(g).

### C. Wisconsin Stats. § 146.82.

Under Wisconsin law, all patient health care records are confidential. *See* Wis. Stat. § 146.82(1). Wisconsin Stats. § 146.82 expressly provides that patient health care records must be released upon request to a health care provider when the performance of the health care provider's duties requires access to the records, and when any of the following apply: (a) the provider is rendering assistance to the patient; (b) the provider is being consulted regarding the health of the patient; (c) the life or health of the patient appears to be in danger and the information contained in the patient health records may aid the provider in rendering assistance; or (d) the provider prepares or stores records for the purposes of preparation or storage of those records. *See* Wis. Stat. § 146.82(2)(a)(2).

Wisconsin Statutes Section 146.84 provides for a private civil cause of action, so that an individual may seek both injunctive relief and damages for violations of Wis. Stat. § 146.82. Wis. Stat. § 146.84(1)(c). Damages for violation of Wisconsin Statutes Section. § 146.82, either negligently or knowingly and willfully, include actual damages, exemplary damages of not more than $25,000, and costs and reasonable actual attorneys' fees. *See* Wis. Stat. § 146.84(1)(b) and (bm).

## ARGUMENT

I. **MHSI Is Entitled To Immediate Injunctive Relief.**

MHSI has filed a Complaint against BCA alleging violations under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., and Wis. Stat. § 146.82(2)(a)(2). Both of these laws apply to BCA's wrongful denial of access to MHSI's patient records and MHSI can show a likelihood of success on the merits of both claims. In addition, MHSI can show the other elements needed to justify issuing injunctive relief, including irreparable harm to MHSI and its patients, no adequate remedy at law and a need to protect the public's interest that is greater than any need to protect the interests of BCA.

A. **MHSI has A Likelihood of Success on Merits on its Computer Fraud and Abuse Act Claim.**

BCA has violated the Computer Fraud and Abuse Act sections 18 U.S.C. § 1030(a)(5)(B) and § 1030(a)(7). To violate 18 U.S.C. § 1030(a)(5)(B), a defendant must: 1) intentionally access; 2) a "protected computer"; 3) without authorization; and 4) cause damage. 18 U.S.C. § 1030(a)(5)(B). BCA's action meets the "intentional access" and "without authorization" prongs of the cause of action because BCA intentionally accessed MHSI's network and server housing patient data without authorization on June 30, 2013. BCA knew, through numerous discussions between Dr. Izard and BCA's CEO, that MHSI needed access to its patient data and that MHSI was relying on BCA to ensure that patient care would not be disrupted while the parties negotiated the $300,000 in alleged overdue payments. It also knew that MHSI's patient medical records were not stand alone records and were only accessible through the Pearl EMR software. Over the last 14 years BCA built the Pearl EMR software for MHSI to create, view and use its patient records over the last five years, MHSI has paid BCA over $3 Million for using the Pearl EMR and the CMS application.

During the parties negotiations, BCA led MHSI to believe that BCA would either keep the Pearl EMR available until the medical records could be secured through another means (Izard Aff., ¶ 17, Exh. A (July 1, 2013 email from Dr. Izard to Albert Woodard stating that MHSI would only use Pearl to view patient medical records until those documents have been secured by another means, that MHSI would not enter new information into the database and that MHSI would continue to work with BCA to resolve all of the other outstanding issues), or provide MHSI with a jump drive containing all of MHSI's patient records in a readable format if BCA did not extend the license agreements (Izard Aff., ¶ 10, Exh. A (July 5, 2013 email from Dr. Izard to Mr. Woodard reminding him of his promise during a June 21, 2013 conference call that BCA could provide MHSI with a jump drive containing MHSI's patient records). BCA did not do either and instead intentionally disconnected MHSI's access to its patient records on June 30, 2013.

BCA's actions meet the "protected computer" prong of the cause of action because MHSI's network and patient data servers are part of an interstate communication system; the network and server are used in communications between MHSI, based in Wisconsin, and outside parties like BCA, based in Georgia. The Act defines a "protected computer" as one that is used in or affecting interstate communication. 18 U.S.C. § 1030(e)(2)(B). Moreover, MHSI's server is internet-based, which also places it into "protected computer" status. *Cont'l. Group, Inc.*, 622 F. Supp. 2d at 1370 (noting that any connection to the internet is part of an interstate communication system).

Finally, BCA caused damage, as defined by the Act, because its action has caused MHSI's patient data to be unavailable. 18 U.S.C. § 1030(e)(8) (defining "damage" as "any impairment to the integrity or availability of data, a program, a system, or information"). MHSI

can show that this damage impairs its ability to care for its patients and threatening the health and safety of those patients, which are two factors that a civil plaintiff may show in order to bring a cause of action under the Act. 18 U.S.C. §§ 1030(g) and 18 U.S.C. § 1030(c)(4)(A)(i)(II) and (IV). Because MHSI can meet all the elements of a cause of action under 18 U.S.C. § 1030(a)(5)(B), it has a likelihood of success on the merits of its Computer Fraud and Abuse Act claim.

In addition, MHSI can demonstrate another violation under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(7). Under that section, MHSI must show: 1) a communication containing; 2) a demand for money or something of value; 3) in relation to damage to a protected computer; and 4) that damage caused to facilitate the extortion. 18 U.S.C. § 1030(a)(7)(C). As contended above, MHSI's network and server qualify as a "protected computer" and the inability to access patient data constitutes "damage" as defined by the Act. Moreover, as with the violation under § 1030(a)(5), the damage caused by BCA impairs MHSI's ability to treat patients and puts the health and safety of those patients at risk. Therefore MHSI meets the two factors required by 18 U.S.C. § 1030(g).

As for elements regarding a "communication containing" a "demand for money," MHSI has produced emails from BCA in which it demands that MHSI pay it $285,097.03, an amount that MHSI disputes, in exchange for allowing MHSI access to its patient records. When MHSI did not pay BCA almost $300,000 by June 30, 2013, BCA accessed MHSI's computer network and server and shut off the Pearl EMR. It also refused to provide MHSI with a jump drive containing MHSI's patient data, even though BCA had discussed such an option with MHSI on June 21, 2013. Because BCA has failed to follow through on its promise to at least provide

MHSI with a jump drive containing the patient data, BCA is using MHSI's inability to access its patient records to facilitate the extortion.

Despite the longstanding relationship between MHSI and BCA, the millions of dollars MHSI has paid to BCA and MHSI's reliance on BCA's product to access patient records, BCA is insisting that it needs MHSI to pay it more money, even though MHSI had made steady payments to BCA through May 2013. MHSI has tried to resolve the disputed payments through continued negotiations and requests for itemized proof that all the work subject to the alleged overdue payments was authorized, yet BCA is unwilling to cooperate and either restore Pearl EMR connectivity or provide MHSI with a jump drive containing MHSI's own patient data in a readable format unless MHSI pays BCA another $300,000. BCA's behavior constitutes extortion and is a violation of the Act under 18 U.S.C. §1030(a)(7).

Because MHSI can meet all the elements of a claim under 18 U.S.C. §§ 1030(a)(5)(B) and 1030(a)(7), MHSI has a reasonable likelihood of success on the merits on its Computer Fraud and Abuse Act claim.

### B. MHSI has A Likelihood of Success on Merits on its Claim Under Wis. Stat. § 146.82.

As noted above, Wis. Stats. § 146.82 expressly provides that patient health care records *shall* be released upon request to a health care provider when the performance of the health care provider's duties requires access to the records, and when any of the following apply: (a) the provider is rendering assistance to the patient; (b) the provider is being consulted regarding the health of the patient; (c) the life or health of the patient appears to be in danger and the information contained in the patient health records may aid the provider in rendering assistance; or (d) the provider prepares or stores records for the purposes of preparation or storage of those records. *See* Wis. Stat. § 146.82(2)(a)(2) (emphasis added). It is undisputed that BCA has not

released any patient records to MHSI, despite numerous requests since July 1, 2013 to do so. BCA's knowing and willful refusal to reconnect the Pearl EMR or provide MHSI with a jump drive containing its patient data in a readable format jeopardizes the health of its patients and warrants the relief permitted under Wis. Stat. § 146.84(1)(b). Because BCA cannot dispute that it has denied MHSI access to its patient records, and because this denial of access constitutes a violation of Wisconsin law, MHSI has a reasonable likelihood of success on its claim brought under Wis. Stat. §§ 146.82 and 146.84.

### C. No Adequate Remedy at Law Exists and MHSI Will Suffer Irreparable Harm.

Courts often merge the elements of no adequate remedy at law and irreparable harm in the preliminary injunction analysis. *See e.g., Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) ("Where the only remedy sought at trial is damages, the two requirements- irreparable harm, and no adequate remedy at law – merge."). In order to demonstrate that MHSI lacks an adequate legal remedy, it must demonstrate that monetary damages would be "seriously deficient as a remedy for the harm suffered." *Id.* A damages remedy can be inadequate if the damage award comes too late or the nature of MHSI's loss may make damages very difficult to calculate. *Id.* A moving party must also demonstrate that it would suffer irreparable harm, which is harm that cannot be prevented or fully rectified by the final judgment after trial. *Id.*

MHSI can show both an inadequate remedy at law and irreparable harm. Monetary damages would be wholly inadequate for MHSI's inability to access its patient records so that it may treat its patients. Indeed, as each day passes without such access, the potential danger to patients health and safety increases. No amount of money could rectify that danger. Only

injunctive relief that compels BCA to immediately restore access to MHSI's patient data in a readable format will suffice.

> D.     **The Balance of Harms Weigh in Favor of MHSI.**

A court should also weigh against a plaintiff's irreparable harm any irreparable harm that the defendant can show he will suffer if the injunction is granted. *Id.* at 387. Here, it is difficult to comprehend the irreparable harm that BCA will suffer if the Court grants MHSI's request for an injunction. In other words, compelling BCA to grant MHSI access to its own patient data either through restoring the Pearl EMR connection or providing MHSI a removable disk containing MHSI patient data in a readable format will not cause BCA irreversible injury. *Id.* Even if BCA obtains a final judgment in its favor, the injunction will not harm it. Any potential injury to BCA pales in comparison to the injury currently being suffered by MHSI, which is crippling its ability to care for thousands of patients in Milwaukee.

> E.     **The Public Interest Weighs in Favor of Granting the Injunction.**

The court must consider the public interest of non-parties in denying or granting the injunction. *Ty, Inc.,* 237 F.3d at 895. "A court when weighing the interests of the private parties and the public interest should try to 'minimize the costs of being mistaken'." *Id.* at 902. The public interest weighs in favor of granting MHSI's request for an injunction. At stake is the health and safety of 40,000 individuals who have patient data on MHSI's servers that is currently inaccessible. BCA is holding that data hostage so that it can force MHSI to pay it almost $300,000, an amount that MHSI disputes and that is the subject of a lawsuit currently pending in the Northern District of Georgia. (Zabawa Aff., ¶¶ 9-10.) MHSI is seeking to transfer that case to the Eastern District of Wisconsin for the reasons set forth in its Motion to Decline to Hear BCA's Declaratory Judgment Action and to Transfer Venue to the Eastern District of Wisconsin.

(Zabawa Aff., ¶ 12.) Neither MHSI nor the thousands of patients it treats can wait for the dispute over how much, if anything, is owed to BCA to work its way through the justice system. MHSI needs access to its patient data now as so many lives depend upon it.

## CONCLUSION

Because MHSI has some likelihood of success on the merits of its causes of action alleged in the underlying Complaint, because monetary damages will not make MHSI whole and because it and the public will suffer irreparable injury if this Court does not grant its request for immediate relief, MHSI respectfully requests this Court to grant its motion for a temporary restraining order or preliminary injunction.

Dated this 15th day of July, 2013.

s/ Barbara J. Zabawa
Barbara J. Zabawa
State Bar No. 1030917
Eugenia G. Carter
State Bar No. 1011447
Melinda Giftos
State Bar No. 1056609

*Attorneys for Plaintiff Milwaukee Health Services, Inc.*
WHYTE HIRSCHBOECK DUDEK S.C.
P.O. Box 1379
Madison, WI 53701-1379
Telephone: 608-255-4440
Fax: 608-258-7138
Email: bzabawa@whdlaw.com
gcarter@whdlaw.com
mgiftos@whdlaw.com