UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**MILWAUKEE HEALTH SERVICES, INC.,**

           Plaintiff,

    v.                                        Civil Action No. 13-CV-797

**BUSINESS COMPUTER APPLICATIONS, INC.,**

           Defendant.

---

### BUSINESS COMPUTER APPLICATIONS, INC.'S RESPONSE AND OPPOSITION TO MILWAUKEE HEALTH SERVICES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

---

Defendant Business Computer Applications, Inc. ("BCA") asks the Court to deny Plaintiff Milwaukee Health Services, Inc.'s ("MHS") motion for preliminary injunction for the following reasons:

MHS has problems. Serious problems. It failed to make payments due to BCA for two software licenses for systems that MHS needs to operate its medical clinic. (Declaration of Albert Woodard ("Woodard Dec."), ¶¶ 14-16). It continues to use one of those systems illegally and in violation of BCA's copyright rights. (Woodard Dec., ¶ 57). A former MHS employee misappropriated $754,731.00. (Declaration of Margaret DeLockery ("DeLockery Dec.", Exhibit A). The Office of Inspector General of the Department of Health and Human Services has asserted that MHS improperly claimed $5,935,960 in unallowable costs. (DeLockery Dec., Exhibit A). Despite the fact that it knew that its five-year software license with BCA would

4827-7415-5285.1

expire on June 30, 2013, MHS failed to either enter a new agreement with BCA or to successfully implement a plan to transition to a new software system for its medical records. As a result of this failure, MHS now claims that it cannot access the medical records of its patients. MHS could have easily solved this problem by purchasing a new software license from BCA; BCA offered a license to MHS on reasonable terms. Or MHS could have purchased different software from a different provider and worked with BCA to transition its medical records to the new system; after all, it has known for five years that its license from BCA would expire on June 30, 2013.

Instead, MHS signed up with a new service provider without informing BCA and apparently began the process of copying the medical records. (Woodard Dec., ¶ 39; Affidavit of Tito Izard ("Izard Aff."), Exhibit A, p. 6 [DOC. NO. 5]). When MHS ran out of time, it demanded that BCA provide month-to-month access for as long as necessary to transition to the new system. (Woodard Dec., ¶ 53). BCA is unable to offer month-to-month access, but it did offer to provide a one-year extension of the license to allow MHS to transition to its new provider. (Woodard Dec., ¶¶ 54, 58).

Unsatisfied with this option, and unwilling to pay BCA even the amounts that are owed with no dispute, MHS elected to use this Court to force BCA to work for free to solve MHS's problem, despite the fact that the parties no longer have any type of relationship. Indeed, in its court papers, MHS identifies no contractual, statutory, or common law duty owed by BCA that would justify the requested injunctive relief. So instead of arguing that BCA owes a duty to MHS, MHS argues that BCA violated two statutes, and that as a result, the Court should order BCA to perform services for MHS for free. However, BCA violated no statutes.

2

MHS has no viable claim under the Computer Fraud and Abuse Act because it cannot establish an even colorable claim that BCA accessed an MHS computer without authority. To the contrary, the contract between the parties granted BCA a specific, contractual right to access MHS's computer and to terminate BCA's licensed software. (Woodard Dec., Exhibits 5 and 8).

MHS has no viable claim under Wis. Stat. § 146.82 because that statute does not offer the rights or relief that MHS claims that it does.

Further, MHS is not entitled to an injunction that would upset the status quo and force former business partners back into a failed relationship that would require court supervision.

Finally, MHS is not entitled to injunctive relief because it comes to this Court with unclean hands. MHS has unclean hands for two reasons—first, because MHS created its own problem through its own reckless conduct; and second, because MHS has been and is engaging in the wrongful use of BCA's software.

MHS's problems are entirely self-inflicted, and its request for an injunction is improper. MHS's motion for preliminary injunction should be denied.

## I. STATEMENT OF FACTS

### A.    BCA AND MHS ENTER INTO SOFTWARE LICENSE AGREEMENTS.

BCA specializes in providing information technology products and services including software, development, hardware, and support services to the healthcare and medical markets. (Declaration of Albert Woodard ("Woodard Dec."), ¶ 2). BCA and MHS executed contracts dealing with two computer medical practice management systems. (Woodard Dec., ¶ 4). First, in November 1999, BCA and MHS entered into a Standard Service Agreement, a Standard Maintenance Agreement, a Standard License Agreement, and a Hardware End User Agreement

4827-7415-5285.1

(collectively referred to as the "CMS Contracts"). (Woodard Dec., ¶ 4).[1] Pursuant to the CMS

Contracts, MHS received a license to utilize certain proprietary software owned by BCA ("CMS

Software"). (Woodard Dec., ¶ 5).

On July 1, 2008, BCA and MHS entered into a Software License Agreement, a Software

Maintenance Agreement, a Service Agreement, an Application Service Provider Hybrid Data

Center Support Services Agreement, a Business Associate Confidentiality Agreement, and a

Third Party Software and Hardware End User Agreement, and a series of Work Order

Agreements (collectively referred to as the "Pearl Contracts"). (Woodard Dec., ¶ 6). The Pearl

Contracts had a five-year term, until June 30, 2013. (Woodard Dec., ¶ 6).[2] Pursuant to the Pearl

Contracts, MHS received a license to utilize additional proprietary software owned by BCA

("Pearl Software"). (Woodard Dec., ¶ 8). The Pearl Software provides for management of

electronic medical records. (Woodard Dec., ¶ 8). Other than routine maintenance issues, MHS

has never complained about the quality or functionality of the services provided under the Pearl

Contracts. (Woodard Dec., ¶ 9). MHS has complained to a limited extent regarding the Pearl

Software. (Woodard Dec., ¶ 9).

**B.      MHS Falls Behind In Making Payments Due Under The CMS And Pearl Contracts.**

While MHS has paid substantial amounts pursuant to the Contracts, for years it carried a

past-due balance. (Woodard Dec., ¶ 14). After a change in MHS's CEO in 2011, MHS's past-

due amounts grew substantially. (Woodard Dec., ¶ 14). For example, MHS has not made

monthly payments of $8443.66 for the Pearl Software for March, April, May, and June 2013.

---

[1] The CMS Contracts are attached to the Woodard Dec. as Exhibits BCA-1 through BCA-4.

[2] The Pearl Contracts are attached to the Woodard Dec. as Exhibits BCA-5 through BCA-10.

4

(Woodard Dec., ¶ 14). An amount totaling $33,774.64 remains unpaid and past due. (Woodard Dec., ¶ 14). It is undisputed that MHS used the Pearl Software during those months.

Similarly, MHS failed timely to make an annual payment of $23,800.30 for the CMS Software that was invoiced in October 2012, and has only paid less than half what was due. (Woodard Dec., ¶ 15). MHS has never disputed those charges, but still has not paid them. (Woodard Dec., ¶ 15). And as the June 30, 2013, expiration date for the Pearl Contracts neared, the past-due balance continued to grow. (Woodard Dec., ¶ 17). MHS currently owes BCA at least $319,733.28, in principal, and $46,842.03 in interest, plus attorney's fees. (Woodard Dec., ¶¶ 18-19).

On November 7, 2012, BCA sent a letter to MHS requesting payment of past-due amounts. (Woodard Dec., ¶ 21).[3] BCA received no response to this letter. (Woodard Dec., ¶ 22).

**C.    Dr. Izard Comes To Georgia And Promises Payment.**

On January 4, 2013, Dr. Tito Izard, the CEO of MHS, came to Georgia to meet with BCA's CEO, Albert Woodard, and BCA's CFO, June Nuckolls, for the purpose of discussing the significant, outstanding balance owed to BCA by MHS. (Woodard Dec., ¶ 23). At the time of the meeting, MHS owed BCA $387,354.46. (Woodard Dec., ¶ 24). During the meeting, Dr. Izard did not dispute that MHS owed that amount to BCA, but did indicate that he believed that MHS was entitled to some credits. (Woodard Dec., ¶ 25). In response, BCA's CFO provided an explanation and documentation that demonstrated that all credits had been properly applied. (Woodard Dec., ¶ 27). During that meeting, BCA also provided Dr. Izard with copies of all open invoices and an accounts receivable aging report. (Woodard Dec., ¶ 26). During that meeting,

---

[3] A true and correct of this letter is attached to the Woodard Dec. as Exhibit BCA-36.

4827-7415-5285.1

Dr. Izard did not complain about the quality or functionality of the services provided under the CMS Contracts and Pearl Contracts. (Woodard Dec., ¶ 28).

Dr. Izard indicated that he wanted for MHS and BCA to continue to work together on a long-time basis, and Dr. Izard agreed that MHS would immediately pay to BCA at least 10% of the amount owed, and that MHS would provide to BCA a plan to pay off the remaining balance owed. (Woodard Dec., ¶ 29). On January 7, 2013, MHS wired $68,493.32 to BCA, which was applied to open invoices from 2012. (Woodard Dec., ¶ 30). However, neither Dr. Izard nor anyone else from MHS ever presented a plan for paying off the remaining balance owed. (Woodard Dec., ¶ 31).

**D.     As The Expiration Of The Pearl License Approaches, MHS's Outstanding Balance Rises.**

As the date of the expiration of the Pearl Software  license approached, MHS's account balance grew. For example, the balance due rose from $275,603.37 as of April 22, 2013 to $319,733.28 as of June 30, 2013. (Woodard Dec., Exs. 21 and 45). On March 28, 2013, BCA sent another letter to MHS requesting payment of the outstanding balance. (Woodard Dec., ¶ 32).[4] BCA received no response to this letter. (Woodard Dec., ¶ 33).

**E.     BCA Provides Notice Of The Termination Of The CMS And Pearl Contracts.**

On June 7, 2013, BCA provided notice to MHS that the licenses granted under the CMS Contracts and the Pearl Contracts would be terminated, effective June 30, 2013, the same date that the Pearl Contracts were expiring. (Woodard Dec., ¶ 35).[5] The termination notice included both the Pearl Software and the CMS Software. (Woodard Dec., ¶ 36).

---

[4] A true and correct copy of this letter is attached to the Woodard Dec. as Exhibit BCA-37.

[5] A true and correct copy of this notice is attached to the Woodard Dec. as Exhibit BCA-38.

On June 21, 2013, two weeks after the notice of termination was provided to MHS, Mr. Woodard conversed with Dr. Izard and sent a follow-up email communication regarding the conversation. (Woodard Dec., ¶ 37).[6] During these conversations, the termination notice and BCA's right to terminate were not disputed by MHS; rather, the conversation focused on the plans for discontinuing the usage of the software. (Woodard Dec., Exhibit BCA-39). It was during this email exchange that BCA became aware that MHS had engaged another service provider some months earlier to replace BCA at the expiration of the Pearl Contracts. (Woodard Dec., ¶ 39). MHS did not inform BCA that it was putting plans in place to "convert" from the Pearl Software to GE Centricity or approach BCA about a conversion contract to migrate data to the new GE system. (Woodard Dec., ¶ 39).

On June 30, 2013, BCA closed MHS's access to the Pearl Software via the remote connection that BCA had used for years pursuant to the Pearl Contracts to manage the services under those contracts. (Woodard Dec., ¶ 40). Specifically, BCA modified its Pearl Software to close MHS's access to the Pearl Software. (Woodard Dec., ¶ 40). When BCA closed MHS's access to the Pearl Software, BCA did not modify, adjust, alter, or damage any software, hardware, computer, or other property of MHS, and did not change any password to any server of MHS. (Woodard Dec., ¶ 41). When BCA closed MHS's access to the Pearl Software, it only modified the Pearl Software, which is the property of BCA. (Woodard Dec., ¶ 42).

MHS has claimed that it does not have the ability to access its patients' medical records, which are in possession and control of MHS, without further and ongoing access to the Pearl Software. (Woodard Dec., ¶ 45). However, MHS has maintained possession at all times of its

---

[6] A true and correct copy of the email exchange is attached to the Woodard Dec. as Exhibit BCA-39.

medical records on a server in Milwaukee and a back-up server in Georgia. (Woodard Dec., ¶ 46). Further, BCA sent to MHS a copy of its data exported from the database software of the Third-Party Provider Oracle on July 17, 2013 . (Woodard Dec., ¶ 45).

BCA's ability to provide MHS with ongoing access to the Pearl Software is dependent upon BCA's contractual relationships with its own service providers, including IBM, Oracle, Cisco, First Databank and Spanish Monograph, Kofax Adrenaline, Crystal Reports, Fujitsu, Zebra, and AT&T. (Woodard Dec., ¶ 47). After July 31, 2013, BCA will not be able to provide any further or ongoing access to the Pearl Software without entering into new contracts with its service providers. (Woodard Dec., ¶ 48). Some of the service providers require a minimum one-year contract and will not provide service on a monthly basis. (Woodard Dec., ¶ 49). Accordingly, BCA offered to provide a one-year extension to the five-year contract with MHS at a commercially-reasonable rate that is commensurate to the historical rate charged by BCA, so that MHS could access the Pearl Software and transition to its new service provider. (Woodard Dec., ¶ 50).[7] MHS declined this offer and has insisted that BCA provide month-to-month access to the Pearl Software indefinitely. (Woodard Dec., ¶ 53). However, BCA cannot provide month-to-month access to the Pearl Software without new contracts with its service providers and without incurring the costs associated with such contracts. (Woodard Dec., ¶ 54).

**F.     MHS Continues To Use The CMS Software Illegally.**

MHS continues to use BCA's CMS Software despite BCA's termination of MHS's license to use the CMS Software, effective June 30, 2013. (Woodard Dec., ¶ 57). BCA has copyright rights in the CMS Software. (Woodard Dec., ¶ 57). MHS has not paid and is not

---

[7] A true and correct copy of this offer is attached to the Woodard Dec. as Exhibit BCA-41 and BCA-42.

4827-7415-5285.1

paying for this ongoing, illegal, and infringing use of CMS. (Woodard Dec., ¶ 57). On July 17, 2013, BCA sent a letter to MHS asking MHS to stop using the CMS Software. (Woodard Dec., ¶ 57).[8] MHS still has not paid the past-due amounts for the CMS Software. (Woodard Dec., ¶ 57).

## G.    The Lawsuits.

On July 8, 2013, BCA filed a lawsuit against MHS in the Superior Court of DeKalb County, Georgia ("First Action"), in which BCA sought to recover the amounts owed by MHS and a declaration that BCA does not have any further or on-going obligation to provide the Pearl Software to MHS.

On July 12, 2013, MHS removed the First Action to the United States District Court of the Northern District of Georgia.

On July 15, 2013, MHS filed in the First Action a Specially-Appearing Defendant Milwaukee Health Services, Inc.'s Emergency Motion to Decline Business Computer Applications, Inc.'s Declaratory Judgment Action and to Transfer Venue to the United States District Court for the Eastern District of Wisconsin.

On July 15, 2013, MHS filed this lawsuit in this Court ("Second Action"). On the same day, MHS filed in the Second Action a Motion for Temporary Restraining Order and Preliminary Injunction. [DOC. NO. 3].

On July 18, 2013, this Court entered an Order denying MHS's motion for temporary restraining order. [DOC. NO. 10].

---

[8] A true and correct copy of this letter is attached to the Woodard Dec. as Exhibit BCA-41.

## II. ARGUMENT AND CITATION OF AUTHORITY

### A. MHS Is Not Entitled To A Preliminary Injunction.

A preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *Manges v. Harman*, No. 3:11CV369, 2011 WL 4478458, at *1 (N.D. Ind. Sept. 26, 2011). The purpose of a preliminary injunction is to preserve the status quo. *EEOC v. City of Janesville*, 630 F.2d 1254, 1259 (7th Cir. 1980). The Seventh Circuit provides an additional four requirements for the issuance of a preliminary injunction: 1) that the plaintiff have a reasonable likelihood of success on the merits; 2) the threat of irreparable harm for which there is no adequate remedy at law; 3) that the threatened injury to the plaintiff outweighs the harm an injunction might inflict on the defendant; 4) that the issuance of a preliminary injunction would not disserve the public interest. *American Can Co. v. Mansukhani*, 742 F.2d 314, 325 (7th Cir. 1984).

The methodology developed by the Seventh Circuit calls on courts to analyze these requirements in a two-phase process—a threshold phase and a balancing phase. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States*, 549 F.3d 1079, 1085-86 (7th Cir. 2008). To survive the threshold phase, a party must satisfy the requirements of irreparable harm prior to final resolution of the case, lack of legal remedies, and some likelihood of success on the merits. *Id.* at 1086. The injunction must be denied if the moving party fails to satisfy any one or more of these requirements. In the second phase, if the movant survives the first phase, the Court must balance the nature and degree of the movant's injury, the likelihood of prevailing at trial, the possible injury to the non-movant if the injunction is granted, and the interests of the public. *Id.*

As demonstrated below, MHS has satisfied none of the requirements for a preliminary injunction.

10

### 1. MHS Seeks To Overturn The Status Quo And Create A New Judicially-Enforced Business Relationship Between BCA And MHS.

Rather than seeking to maintain the status quo, MHS is asking the Court to force the parties back into a business relationship that both parties agree expired. In its proposed temporary restraining order, MHS asked the Court to order BCA to take whatever steps that would be necessary to "provide complete, unrestricted access to all medical records," and to "assist Plaintiff with securing those records so that Plaintiff can use those records immediately for treating patients." Such an arrangement would be fraught with problems as BCA would be forced to expend unknown costs in this effort, and the Court would have to monitor the parties' judicially-mandated business relationship. (Woodard Dec., ¶ 61).

In *Janesville*, the Seventh Circuit reversed a preliminary injunction that had reinstated a city's police chief after the city had involuntarily retired him. 630 F.2d at 1259. The court noted that the injunction had not preserved the status quo and had instead created new problems, including the fact that the city was forced to pay an additional unanticipated salary and pension expense, the duration of which was unknown. *Id.* In *Original Great American Chocolate Chip Cookie Co.. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 277 (7th Cir. 1992), the Seventh Circuit reversed a preliminary injunction that reinstated a terminated franchise relationship. Judge Posner observed that the improper injunction required the parties to maintain a cooperative relationship for the duration of the injunction, and that such an injunction imposed a burdensome duty of on-going supervision on the issuing court. *Id.*

In this case, this Court should decline to upset the status quo and reject MHS's request that the Court force the resumption of an expired and failed business relationship.

4827-7415-5285.1

2.  **MHS Has No Meaningful Chance Of Success On The Merits Of Its Claims.**

   a.  **MHS Cannot Succeed On Its Claims Under The Computer Fraud And Abuse Act.**

The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), is primarily a criminal statute that also provides a civil remedy. *Power Equip. Maint., Inc. v. Airco Power Servs., Inc.*, No. CV413-55, 2013 WL 33422779, at *4 (S.D. Ga. June 28, 2013). The CFAA was drafted to combat computer hacking. *Id. See also Int'l Ass'n of Machinists and Aerospace Workers v. Werner-Masuda,* 390 F. Supp. 2d 479, 495 (D. Md. 2005) (general purpose of CFAA's civil remedy was to create a cause of action against hackers). The statute was never intended, however, to provide a basis for forcing a software company to work for free for a former customer, so it is not surprising that MHS's attempt to apply this statute to the present situation is awkward and ill-fitting.

MHS alleges two violations of the CFAA. First, MHS alleges that BCA violated 18 U.S.C. § 1030(a)(5) when BCA modified the Pearl Software to close MHI's access to the Pearl Software, following the expiration and termination of MHS's license to use the Pearl Software. (Complaint, ¶ 29). This claims fails because BCA had contractual authority to both access MHS's computer and to close MHS's access to the Pearl EMR. Second, MHS alleges that BCA committed extortion in violation of 18 U.S.C. § 1030(a)(7). This claim fails because a request that a company pay for the use of licensed software does not constitute a threat to damage a computer.

   i.  **MHS Has No Claim Under 18 U.S.C. § 1030(a)(5).**

In order to establish liability under this section, MHS would have to plead and prove that BCA accessed MHS's computers without authority. *See* 18 U.S.C. § 1030(a)(5) . *See also Secureinfo Corp. v. Telos Corp.*, 387 F.Supp.2d 593, 608 (E.D. Va. 2005). However, a person

12

with a contractual right to access a computer does not act without authority and cannot be liable under 18 U.S.C. § 1030(a)(5). *Worldspan, L.P. v. Orbitz*, *LLC,* No. 05C5386, 2006 WL 1069128, at *4 (N.D. Ill. April 19, 2006). This principle is fatal to MHS's claim.

In *Worldspan*, Worldspan alleged that Orbitz had been permitted access to Worldspan's computer for certain, specified purposes, but that Orbitz had exceeded the degree of permissible access. *Id.* In granting Orbitz's motion to dismiss for failure to state a claim under CFAA, the court noted that while 18 U.S.C. § 1030(a)(5) was limited to the access of a computer "without authority," other sections of the statute also applied to situations where the access exceeds authority. *Id.* Thus, the court found that "unauthorized access" as set forth in 18 U.S.C. § 1030(a)(5) did not include conduct was that was merely "exceeding authorized access." *Id.* The court concluded that Worldspan had failed to state a claim under the CFAA because Orbitz had a contractual right to access Worldspan's computers. *Id.*

In this case, the Pearl Contracts gave BCA the right to access MHS's computers, as well as the right to terminate MHS's access to the Pearl Software.

Under the Application Service Provider Hybrid Data Center Support Services Agreement ("Data Center Agreement"), BCA was responsible for installing and maintaining all Oracle Database related software as well as maintaining the licensed Pearl Software. (Woodard Dec., Exhibit BCA-8). As the Oracle Database Administrator's ("DBA"), BCA was required to perform certain system administrator functions including (a) overseeing system storage, (b) controlling all application programs, (c) managing system process performance and (d) "controlling access to and from remote systems by controlling the access permissions in both directions." (Woodard Dec., Exhibit BCA-8 (Data Center Agreement ¶2.2.2 (a), (b).)). It was further agreed that, as "the System Administrator, [BCA] is responsible for access to remotely

13

owned data and therefore must control the methods and availability of access to such data."
(Woodard Dec., Exhibit 8 (Data Center Agreement ¶2.2.2(b).)  MHS provided the central server
at the Data Center, but was permitted to "move the location of the Data Center as necessary,…so
long as BCA's access to the access server and Licensed Software is maintained."  (Woodard
Dec., Exhibit BCA-8 (Data Center Agreement ¶2.2.1)

     Under the terms of the software license agreement for the Pearl Software, MHS
specifically acknowledged and agreed "that BCA expressly reserves the right to terminate the
operation of the Licensed Program [Pearl Software], without liability to Customer [MHS], in the
event that the Customer fails to abide by its payment obligations under Article III hereof."
(Woodard Dec., Exhibit 5, ¶8.2)

     Thus, BCA had a contractual right to access MHS's computers and a contractual right to
close  MHS's access to the Pearl Software.  Further, MHS's license to use the Pearl Software had
expired by terms, so it no longer had any right to continued access and use of the Pearl Software.

     Additionally, when BCA closed MHS's access to the Pearl Software, BCA did not
modify, adjust, alter, or damage any software, hardware, computer, or other property of MHS; it
only modified the Pearl Software, which is the property of BCA.  (Woodard Dec., ¶¶ 41-42).

     Accordingly, MHS has not and cannot establish that BCA accessed its computer without
authority.  MHS essentially concedes this point in its Complaint by arguing that the lack of
authority stems from MHS's allegation that BCA had assured MHS "that patient care would not
be disrupted."  (Complaint, ¶ 26).  MHS's theory—that a contractual right to access can be
abrogated by a vague, alleged promise regarding the non-disruption of patient care—lacks any
basis in the law.

14

Further, the weight of the evidence belies the contention that BCA made any such promises or gave any such assurances to MHS. First, MHS was aware that the Pearl License was going to expire by its terms on June 30, 2013. (Izard Affidavit, ¶ 9 [DOC.NO. 5]). Second, BCA sent MHS a letter on June 7, 3013, informing MHS that both the CMS license and the Pearl License would be terminated, effective June 30, 2013, the same date that license would expire. (Woodard Dec., Exhibit BCA-38). Finally, on June 21, 2013, Mr. Woodard sent Dr. Izard an email message in which Mr. Woodard reminded Dr. Izard that BCA had previously provided MHS with a notice that the CMS and Pearl licenses would be terminated as of June 30. (Woodard Dec., Exhibit BCA-39). Mr. Woodard asked Dr. Izard to provide MHS's plans to discontinue use of CMS and Pearl and to return BCA's programs and documents within three days. (*Id*.). Mr. Woodard also stated that BCA would be willing to provide a new Pearl license for a three or five year term. (*Id*.). Mr. Woodard informed Dr. Izard that MHS would need to let BCA know if it was interested in a new license by June 30, 2013. (*Id*.). Dr. Izard responded to Mr. Woodard's email the same day. (*Id*.). Dr. Izard provided one point of clarification—he stated that he would provide more clarity regarding MHS's "discontinuation" of BCA products, and claimed that he would need longer than three days to return BCA's documents and products. (*Id*.). There is nothing in this email exchange to suggest that BCA had guaranteed that there would be no disruption in patient care or that software usage would continue without a new license agreement. To the contrary, Mr. Woodard made it clear that the license would terminate as of June 30 unless MHS and BCA agreed on a new three to five year contract. Dr. Izard said nothing in response to dispute that.

15

MHS alleges that BCA, by informing MHS that BCA would not be interested in providing further services or in establishing a new business relationship following the expiration and termination of the licenses, unless and until MHS agreed to a new license agreement and agreed to pay the outstanding balances due with respect to the CMS license and the Pearl license, committed extortion under the CFAA.  MHS's claim is frivolous.

18 U.S.C. § 1030(a)(7) makes it a crime for any person, with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing A) threat to cause damage to a protected computer; B) threat to obtain information from a protected computer without authorization or in excess of authorization or to impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access; or C) demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion.   Under federal law, "extortion means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).

MHS bases its claim under this section of the CFAA on its allegation that BCA made a "demand for $300,000 in exchange for reconnecting the Pearl EMR or providing MHSI with a jump drive containing MHSI's patient data in a readable format." (Complaint, ¶ 30).  MHS further alleges that this demand "caused damage to MHSI's patient database by making the data unavailable and constitutes extortion…" (Complaint, ¶ 30).

MHS has no claim for extortion under CFAA for two primary reasons.  First, MHS cannot show that any conduct of BCA was "wrongful."  There was nothing wrongful about BCA informing MHS that the Pearl license was terminated or that it had expired by its terms.

16

Likewise, there was nothing wrongful about BCA informing MHS that it would enter into a new business relationship only under certain terms. *Arnhold and Byzantio, LLC v. Ocean Atlantic Woodland Corp.*, 284 F.3d 693, 705 (7th Cir. 2002) ("Freedom not to contract should be as protected as stringently as freedom to contract").

Second, MHS has not alleged that BCA violated any of the three specific subsections of 18 U.S.C. § 1030(a)(7). Instead, MHS makes a single, curious allegation to attempt to support its claim under 18 U.S.C. § 1030(a)(7): that BCA's *demand* for a new contract and to be paid the outstanding balance on the old contracts *caused damage* to MHSI's patient database by making the data *unavailable*. (Complaint, ¶ 30). MHS provides no explanation in either the Complaint or the brief in support of its motion for preliminary injunction as to how a demand caused damage by making data unavailable. And as shown below, MHS's allegations do not establish violations of any of three sub-parts of 18 U.S.C. § 1030(a)(7).

18 U.S.C. § 1030(a)(7)(A) makes it a crime for any person, with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing a threat to cause damage to a protected computer. MHS not alleged that BCA ever threatened to cause damage to MHS computers. MHS merely alleged that BCA requested that it be paid for past work, and that MHS enter into a new agreement if MHS wanted further usage of the Pearl Software after the expiration and termination of the old license agreement. Further, the only damage that MHS has suffered is an alleged inability to access its medical records, which was the result of MHS's own failure to either reach terms with BCA for a new Pearl license or to make alternative arrangements. BCA never threatened to damage any components or software of MHS, and MHS has made no allegations to that effect. BCA just refused to work for free after the expiration and termination of the Pearl license.

17

18 U.S.C. § 1030(a)(7)(B) makes it a crime for any person, with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing a threat to obtain information from a protected computer without authorization or in excess of authorization or to impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access. MHS made no allegation that BCA threatened to obtain information or impair the confidentiality of information without authority. Further, as explained above, BCA did not act without authority with respect to MHS's computers.

18 U.S.C. § 1030(a)(7)(C) makes it a crime for any person, with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing a demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion. In this case, there was no damage to MHS's computer, much less damage caused to facilitate extortion. There is only an alleged inability by MHS to access all of its medical records. And that inability was not caused by BCA; BCA merely declined to continue to provide services to MHS after the expiration and termination of the Pearl license without a new agreement in place.

Accordingly, MHS has not properly alleged the elements of any of the three sub-sections of 18 U.S.C. § 1030(a)(7) and has failed to show a substantial likelihood of success on the merits.

### b. MHS Cannot Succeed On Its Claim Under Wis. Stats. § 146.82.

Sections 146.82 through 146.84 of the Wisconsin Statutes provide a regulatory framework for protecting the confidentiality of patient care records – not a sword at the point of which medical providers may force former contractors to resume work following the expiration of their relationship. Insofar as pertinent here, Wis. Stats. § 146.82(1) specifies that such records

18

may be released only to specified recipients or with the informed consent of the patient. Section 146.82(2)(a) – the provision principally relied on by MHS – then spells out several exceptions to the informed-consent requirement.

MHS would turn this statutory scheme on its head, converting § 146.82(2)(a) into a generalized command to the world at large to provide assistance in reviewing patient care records, without limit and without charge, to any health care provider who claims to need them. That contention fails at the basic level of the statute's plain meaning. On its face and without any colorable ambiguity, §146.82(2)(a) applies to patient health care records themselves – not to software facilitating review of such records. MHS already has the health care records in question. (Woodard Dec., ¶ 46). What it is seeking from BCA is not the records per se but the help of BCA's software in accessing, reviewing, converting, and migrating those records. Giving defaulting ex-licensees access to software on any terms (much less for free) is a topic that § 146.82(2)(a) does not address.

Even if this plain-meaning issue were ignored – and, of course, it should not be – MHS's contention would be mistaken for at least two reasons: (1) by disregarding the directly applicable provision of the statutory scheme, it deforms the clear meaning of the statute beyond recognition; and (2) it disregards the territorial limits on Wisconsin's statutory authority.

> **i.    MHS Takes § 146.82(2) Out Of Context, Badly Obscuring The Intended Meaning Of The Statutory Scheme As A Whole.**

MHS's § 146.82(2) argument is an exercise in rhetorical contortion. Under that provision, MHS is a potential beneficiary of exceptions to the general rule that patient records be released only with the patient's informed consent. MHS tries to twist that exception into an entitlement to demand assistance in reviewing patient care records, for its own benefit and regardless of circumstances. Such intellectual gymnastics invite rejection on their own terms.

4827-7415-5285.1

At least equally important, MHS's argument ignores the statutory provision that specifically, expressly, and unambiguously addresses the very issue MHS raises.

Wis. Stats. § 146.83(1m) deals with the right of a patient's health care provider to have access to the patient's health care records. That, of course, is the right that MHS purports to try to vindicate here. Section 146.83(1m)(a) specifies that, "A patient's health care records shall be provided to the patient's health care provider upon request" and, subject to the exceptions in § 146.82(2), with informed consent. Section 146.83(1m)(b) then provides that, "The health care provider under par. (a) may be charged reasonable costs for the provision of the patient's health care records."

That, without more, is fatal to MHS's claim under § 146.82(2)(a). MHS does not have the right to get anything at issue here for free. Leaving aside for the moment the fact that it is health care records and not access to software that these statutory provisions address, it is undisputed that BCA ended MHS's access to BCA's software only after MHS's license to use the Pearl EMR had expired and had been terminated for non-payment.

MHS's brief passes in bashful silence over § 146.83(1m)(b); however, such reticence is perhaps understandable. Even if § 146.82(2)(a) could somehow be read as imposing a duty on the world at large to release health care records to specified recipients, it could not colorably be read in light of § 146.83(1m)(b) as requiring that software assistance be provided unconditionally and for free – which is what MHS is asking for. It is elementary that a statutory scheme must be interpreted as a coherent whole rather than as a collection of isolated fragments taken out of context, *see, e.g., Milwaukee Gun Club v. Schulz*, 979 F.2d 1252, 1255 (7th Cir. 1992), and that within a statutory scheme a specific and concrete provision will control over one that is general and abstract. *See, e.g., State v. Hemphill*, 2006 WI APP 185, ¶ 11, 296 Wis. 2d 198, 207, 722

4827-7415-5285.1

N.W.2d 393 (" . . . when courts construe statutes, specific language controls over general language.").

<blockquote>
ii.    **Wisconsin Neither Has Nor Claims Authority To Require A Software Provider Outside Of This State To Perform Non-Contractual Services Outside Of This State For The Benefit Of A Defaulting Wisconsin Party.**
</blockquote>

The regulatory authority of any state is presumptively limited by its own borders. *See Morley-Murphy Co. v. Zenith Electronics Corp.*, 142 F.3d 373, 378-79 (7th Cir. 1998) (noting presumption against extraterritoriality and predicting that Wisconsin Supreme Court would not interpret Wisconsin Fair Dealership Law as permitting recovery of damages by Wisconsin dealer for sales lost outside of Wisconsin because of wrongful termination of dealership). That principle poses an insurmountable obstacle to the injunctive relief that MHS seeks here.

MHS is not trying to have medical records for Wisconsin patients sent from Georgia to Wisconsin. Instead, it is asking this Court to order a Georgia company to perform services in Georgia on equipment and software located in that state so that a Wisconsin company can more efficiently review medical records which that company already has and which are already located in Wisconsin. (Woodard Dec., ¶ 46). MHS makes this demand on the basis of a Wisconsin statute, without explaining how the Wisconsin Legislature could possibly have imagined that it had authority to regulate conduct in Georgia.

In *Morley-Murphy, supra*, the Seventh Circuit concluded that the Wisconsin Legislature did not intend for the WFDL to apply extraterritorially even though the statute expressly provided that it was to apply "to the full extent" of Wisconsin's constitutional authority. *See Morley-Murphy*, 142 F.3d at 380 (quoting statute). There is no comparably ambitious expression of legislative intent in the case of § 146.82(2)(a). *A fortiori*, that statute cannot plausibly be

interpreted as requiring a company outside this state to perform services outside this state and provide free use of software products outside this state.

MHS has no one but itself to blame for the troubles it complains of here. It failed to pay its bills, despite extraordinary indulgence on BCA's part. It is in the position of someone who injures his hand by angrily slamming his fist into a brick wall, and then blames the wall for his pain and suffering. Section 146.82(2)(a) of the Wisconsin Statutes gives MHS no colorable claim whatever upon the equitable authority of this Court.

### 3. MHS Has Shown No Irreparable Injury For Which There Is No Adequate Remedy At Law.

An injury is irreparable when the threatened harm would impair the court's ability to grant an effective remedy. *Enverve, Inc. v. Unger Meat Co.*, 779 F.Supp.2d 840, 844 (N.D. Ill. 2011). An injury is not irreparable if the party seeking the injunction as an adequate alternative remedy. *Id.* For the reasons set forth below, MHS has failed to establish irreparable injury.

First, it appears that MHS's loss of access to its medical records is not as extensive as claimed. In MHS's very first communication to BCA following the close of access to the Pearl Software, Dr. Izard did not indicate that MHS had the lost the ability to access all of MHS's medical records. (Izard Aff., Exhibit A, p. 6 [DOC NO. 5]). Rather, he stated that the loss of access had caused the staff to "not (be) able to continue to make copies of the patient's progress notes for patient care." (*Id.*). This is a far cry from MHS's later rhetoric regarding its ability to access its medical records.

Second, MHS waited for two weeks after the expiration of the contracts, and after it been served with BCA's lawsuit in Georgia, before it was moved to file this lawsuit. That delay belies the seriousness of MHI's claimed injury.

Third, Dr. Izard and MHS have recently made statements to the press explaining that MHS has alternative methods of accessing medical records. For example, in a recent article, Dr. Izard stated that MHS's health care providers could in fact "get key information, such as medication lists and lab results …" (DeLockery Dec., Exhibit B).

Fourth, MHS has provided only general and conclusory allegations of irreparable injury. *Khalik v. U.S. Dep't of Agric.*, No. 94C5809, 1994 WL 548213, at *2 (N.D. Ill. Oct. 5, 1994) (conclusory and speculative allegations cannot establish irreparable injury). MHS has generally averred that its inability to access medical records will harm patients. However, it appears that MHS has continued to serve patients, which suggests that it is able to provide an acceptable level of care. Further, the evidence shows that MHS was in the process of printing medical records when its access to the Pearl Software was closed, and that MHS has access to the "key information" needed for patient care. (Izard Aff., Exhibit A, p. 6 [DOC NO. 5]; DeLockery Dec., Exhibit B).

Finally, MHS has conceded that a court order forcing BCA to resume the provision of the services to MHS is not the only available option. Dr. Izard concedes that MHS could hire a computer programmer to assist with the retrieval of the medical records, but claims that *could* take a very long time. (Izard Aff., ¶ 18 [DOC NO. 5]). Based on this statement, it is apparent that MHS has not thoroughly explored its options. Of course, MHS could have selected the commercially-reasonable route of extending its contract with BCA. Instead, it chose to ask this Court to order BCA to resume a relationship with MHS in order to reduce costs and assuage MHS's self-inflicted problem. MHS has failed to show irreparable injury.

23

4.   **MHS Has Failed To Show That Its Threatened Injury Outweighs The Harm An Injunction Might Inflict On The Defendant.**

In terms of injury, MHS has made conclusory allegations that it its ability to care for patients has been and will be harmed by an inability to access medical records. However, it has made no specific demonstration that its ability to care for patients has been seriously impaired. And as noted above, there is significant evidence that MHS's plight, which is of its own doing, is not as dire as MHS has portrayed.

On the other hand, as Judge Posner recognized in *River Valley Cookies*, there is real and indeed, irreparable, harm inflicted when a business is forced by court order to resume a relationship with a former business partner who violated the contracts between the parties and infringed on the business's intellectual property. 970 F.2d at 277. That is precisely what MHS is asking this Court to do.

It is undisputed that MHS has failed to pay at least some of the amounts due. (Woodard Dec., ¶¶ 14-15). It is likewise undisputed that MHS has used and continues to use the CMS Software, in which BCA has copyright rights, illegally and without compensation. (Woodard Dec., ¶ 57). In *River Valley*, Judge Posner found that it would inflict irreparable harm on a franchisor to force it to re-enter a business relationship with a franchisee that had breached the franchise agreement and infringed on the franchisor's intellectual property. 970 F.2d at 277. The injunction requested by MHS in this case would inflict this same type of irreparable harm on BCA.

5.   **Issuance Of The Injunction Would Disserve The Public Interest.**

As discussed above, an injunction that upsets the status quo and forces former business partners to resume a cooperative relationship imposes an improper burden on the issuing court and drains judicial resources. *River Valley Cookies*, 970 F.2d at 277 ("Such an injunction

24

imposes a continuing duty of supervision on the issuing court, and this can be a drain on scarce judicial resources"). During this time of sequestration and cuts to the judiciary, this type of continuing duty is even more burdensome. As a practical matter, this case was filed simply because MHS thought that this Court would create and enforce a software agreement on more favorable terms than MHS could obtain in the commercial marketplace. With respect to the impact of MHS's inability to access medical records on patients, MHS simply needs to find a different way to solve its problem other than an injunction that would drain judicial resources and force BCA back into a business relationship with MHS.

### 6. MHS'S Request For Equitable Relief Is Barred By Its Unclean Hands.

The substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief are not altered by Rule 65 and depend on traditional principles of equity jurisdiction. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999). Unclean hands may bar equitable relief, such as a preliminary injunction. *BeerMart, Inc. v. Stroh Brewery Co.*, 804 F.2d 409, 413 (7th Cir. 1986). MHS's hands are unclean because 1) it recklessly created its own predicament; and 2) it has violated BCA's intellectual property rights in CMS.

First, the Seventh Circuit has held that equitable remedies are unavailable to a party whose injury was caused by the party's own reckless conduct. *TRW Title Ins. Co. v. Security Union Title Ins. Co.*, 153 F.3d 822, 829 (7th Cir. 1998) ("To allow an unjust enrichment claim in these circumstances would be to convert this equitable action into an insurance policy for those who gamble by avoiding safeguards they know they should take).

That is precisely what happened in this case. MHS's alleged inability to access patient records is the result of its own reckless conduct. It is MHS that has a duty to its patients to properly maintain medical records, not BCA. BCA fulfilled its contractual duty by providing

25

access to the Pearl EMR until the expiration of the license. On the other hand, MHS breached its duty to its patients by failing to ensure that it could maintain access to the records. From the day in 2008 that MHS contracted with BCA for the use of the Pearl EMR, MHS knew that the license would expire on June 30, 2013 and that it would need to either extend its existing license or transition to a new system.

At the same time that Dr. Izard was assuring Mr. Woodard that MHS desired a long-term relationship with BCA, and that MHS would pay the outstanding balance owed to BCA, MHS was planning to change providers and copy the medical records. (Woodard Dec., ¶ 29 and Exhibit BCA-39, p. BCA-305). MHS was gambling that it could transition to a new system before the expiration of the Pearl license and then leave BCA stuck with the outstanding balance. But MHS ran out of time. MHS gambled and lost. At the very minimum, MHS recklessly failed to properly maintain and protect its access to its medical records. MHS is not entitled to an injunction to force BCA to solve MHS's self-inflicted problems. *TRW Title Ins.*, 153 F.3d at 829.

Second, MHS has unclean hands because it breached its agreements with BCA and has used, and continues to use, BCA's software illegally and without payment. (Woodard Dec., ¶¶ 14-16, 57). In *River Valley*, the court found that a franchisee was not entitled to a preliminary injunction in part because the franchisee had infringed upon the franchisor's intellectual property. 970 F.2d at 281. Similarly, in this case, MHS's wrongful conduct bars equitable relief.

### III. CONCLUSION

For the foregoing reasons, BCA respectfully asks the Court to deny MHS's motion for preliminary injunction.[9]

This 25th day of July, 2013.

Respectfully submitted,

s/ Michael A. Bowen
Michael A. Bowen, WI Bar Number 1016965
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee WI 53202-5306
Telephone: (414) 271-2400 (general)
Telephone: (414) 297-5538 (direct)
Facsimile: (414) 297-4900
E-mail: mbowen@foley.com
*Attorney for Defendant*

---

[9] BCA notes that MHS filed a Notice of Motion and Motion to Supplement The Record [DOC. NO. 12], yesterday, the day before this response was due. Through this motion, MHS seeks to supplement the record with respect to its motion for preliminary injunction with an additional affidavit. MHS did not request expedited treatment of the motion, and BCA intends to respond to the motion in due course. Should the Court be inclined to consider either the motion or the supplemental affidavit on an expedited basis, BCA would respectfully request a reasonable opportunity to respond.

27

4827-7415-5285.1